# Attachment 1

# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
### WESTERN DIVISION

_____

THE PROCTER & GAMBLE
COMPANY and subsidiaries,

      Plaintiff,

      vs.

UNITED STATES OF AMERICA,


      Defendant.
_____

No. 1:08-cv-608
Judge Weber
Judge Wehrman


**PLAINTIFF'S MEMORANDUM IN SUPPORT OF ITS
MEMORANDUM IN SUPPORT OF ITS
MOTION IN LIMINE
<u>TO EXCLUDE TESTIMONY OF NICHOLAS D'AMBROSIO, JR.</u>**

SUTHERLAND ASBILL & BRENNAN LLP
1275 Pennsylvania Avenue, NW
Washington D.C. 20004
Telephone: 202.383.0100
Facsimile: 202.637.3593


*Attorneys for Plaintiff The Procter & Gamble Company*

# I.  INTRODUCTION

This <u>Daubert</u> motion relates to purported expert testimony that the Government intends to offer through Nicholas D'Ambrosio, Jr.  Mr. D'Ambrosio is one of two appraisal witnesses the Government has indicated it intends to call in this case concerning the technology donations issue.  Mr. D'Ambrosio has submitted reports purporting to value the seven technologies with medical applications.[1]  Six of the seven are novel pharmaceutical technologies with the potential to be developed into new drugs.[2]

Prior to his involvement in this case, Mr. D'Ambrosio had never before valued a set of patents covering a drug treatment like the ones at issue here.  As a result, Mr. D'Ambrosio created a new valuation model for purposes of this case.  Although he purports to base his novel model on several articles that address the pharmaceutical industry generally, those articles address completely different subject matter and contradict Mr. D'Ambrosio's approach and his underlying assumptions in numerous ways.  As Mr. D'Ambrosio himself conceded at his deposition, he "diverged" from them "in many, many ways."   (Dep. Vol. 1 at 158.)[3]  As described in detail below, the result is a flawed methodology that is not the product of reliable principles and methods.  His opinions therefore fail to meet the standard for expert testimony set by <u>Daubert v. Merrell Dow Pharm., Inc.</u>, 509 U.S. 579 (1993) and Federal Rule of Evidence 702.

---

[1]     The seven medical technologies appraised by Mr. D'Ambrosio are: Hair Growth, Cancer/HIV/HCV, Cox-2, Photodynamic Therapy, Prostaglandin Hair Growth, Prostaglandin Glaucoma, and Colonic Delivery.   Mr. D'Ambrosio prepared nine separate appraisals (attached as Exhibits A-I) for these seven technologies, because he broke the Cancer/HIV/HCV into three appraisals.

[2]     The one exception is the Colonic Delivery Technology, which is a drug delivery technology that would be used in combination with a drug.

[3]     Mr. D'Ambrosio's 2-day deposition is attached as Ex. J (Vol. 1) and Ex. K (Vol. 2).

## A.    Background to the Technology Donations Issue

The principal issue in this case concerns the value of 14 patented technologies that P&G donated to universities and other non-profit institutions.  The donated technologies include medical technologies (such as potential drugs for the treatment of cancer, glaucoma, and hair loss) and non-medical technologies (such as new insecticide and paper-making technologies).  The Tax Code and associated regulations provide that P&G is entitled to a tax deduction for these donations in an amount equal to the appraised fair market value of the technologies.  See 26 U.S.C. § 170; 26 C.F.R. § 1.170A-1.

At the time of each donation, P&G commissioned an independent appraisal of each technology, and it claimed a tax deduction on its tax return in an amount equal to the appraised value.  During its regular audit of P&G's returns, the IRS did not dispute that the donations qualified for a tax deduction.  But it claimed, based on its own appraisals of the technologies, that the fair market value was less than what P&G claimed, and it assessed additional tax accordingly.  P&G subsequently brought this case for a refund.

As part of this litigation, the Government, now represented by the Department of Justice, hired Mr. D'Ambrosio and one of his colleagues at Grant Thornton, James Woods, to provide yet another set of appraisals of the technologies.  Mr. D'Ambrosio prepared appraisal reports for the 7 medical technologies.  Mr. Woods appraised the other technologies.

## B.    Mr. D'Ambrosio's Opinions in this Case.

### 1.    Mr. D'Ambrosio's Background and Qualifications

Mr. D'Ambrosio is a lawyer.  (See CV included in each appraisal.)  Although he is also a CPA, his only graduate degree is his law degree.  (Dep. Vol. 1 at 54-55.)  After graduating from law school in 1986, Mr. D'Ambrosio practiced litigation for three years.  Subsequent to that, he

has worked for a succession of consulting firms performing "litigation services," or as he sometimes calls it, "dispute related services." (<u>Id</u>. at 24-43.)  Mr. D'Ambrosio's resume shows that over the last 4 years, he has testified in 18 different cases.  (CV.)

Although Mr. D'Ambrosio has appraised other types of property during his career, prior to this case, he had never been engaged to value a set of patents covering a drug treatment.  (Dep. Vol. 1 at 15.)  At his deposition, Mr. D'Ambrosio acknowledged that prior to this case, he had "no information … one way or the other" about the methods used to value drugs "since [he] hadn't studied the issue."  (<u>Id</u>. at 242.)  Because of this lack of experience, he indicated that he "had to spend additional effort to learn and study carefully" the materials in the case.  (<u>Id</u>. at 18.) This required him, among other things, to research the ways drug technologies were valued.  (<u>Id</u>. at 16, 20.)  As he explained: "Everyone has to do a valuation for the first time in a new area." (<u>Id</u>. at 18.)

> 2.   <u>Mr. D'Ambrosio's General Approach</u>

Mr. D'Ambrosio's appraisals all follow the same basic approach, which is to value each technology by reference to the amount of income it would be expected to generate if it was successfully developed into a new drug.  His approach has six basic steps:

> 1.   Determine the drug's future sales revenues over its expected life for each of five "quality levels": (1) "breakthrough"; (2) above average; (3) average; (4) below average; and (5) "dog";
>
> 2.   Multiply the projected sales for each of the five "quality levels" by the probability of successful development;
>
> 3.   Subtract out the costs necessary to produce the revenues;
>
> 4.   Discount to present value the resulting cash flows for each of the five quality levels.  (D'Ambrosio calls the result of this calculation the "indicated value" for each of the five "quality levels");

5. Multiply each of the five "indicated values" by a probability assigned to each of the five "quality levels." (This calculation yields what D'Ambrosio calls the "expected value" for each "quality level"); and

6. Add the five "expected values" for the drug. To that sum, add the tax benefit of amortization of the drug's purchase price (where applicable). The result is what Mr. D'Ambrosio calls the "risk adjusted net present value" ("rNPV") of the technology.

(See generally, e.g., Ex. A- Cancer Appraisal at 81-88 & Schedules 3-7 ("indicated values" for each quality level); Schedule 1 ("expected values" for each quality level)).[4]

Each of these steps affects the overall calculation, but the first step – the projection of future sales – is obviously of critical importance because it is the starting point for the entire calculation and determines the overall revenue base. The higher the projected sales revenue, the higher the overall value of the technology. Because this motion challenges the methods that Mr. D'Ambrosio used to project revenues, his approach for this step will be discussed in some detail below.

3. Mr. D'Ambrosio's Projection of Revenues

As mentioned, Mr. D'Ambrosio projected that if a drug was successfully developed, it would fall into one of five quality levels: (1) "breakthrough," (2) "above average," (3) "average," (4) "below average", and (5) "dog." He assigned a 60% probability to the "average" scenario and a 10% probability to each of the other four scenarios (a total of 40%). Mr. D'Ambrosio's description of his method for P&G's Cancer Technology is illustrative and is reproduced below:

---

[4] Even though the Colonic Delivery Technology is a drug delivery technology and not a new drug, Mr. D'Ambrosio applies the same basic method in determining its value under an income approach. In the case of that technology, however, he also values the technology using a cost approach to value, because he claims the technology can be designed around without infringing the donated patents. (Ex. D- Colonic Delivery Appraisal at 80-85.)

**Excerpt from D'Ambrosio Appraisal of the Cancer Technology (Ex. A at 83-84):**

As the passage above describes, Mr. D'Ambrosio's approach was first to determine the peak revenues for the "average" scenario. He then determined a projected peak revenue number for the other four scenarios – "breakthrough," "above average," "below average," and "dog." The revenues for these other scenarios follow a consistent pattern throughout Mr. D'Ambrosio's reports. The revenues for the breakthrough scenario, for example, are always 4.26 times the revenues for the "average" scenario. Revenues for the other scenarios – "above average," "below average," and "dog" – similarly follow a designated multiple of the "average." "Above average" revenues are set to be 2.06 times the "average," "below average" revenues are set to be 0.48 times the average, and "dog" revenues are set to be 0.23 times the "average." The point is illustrated in the table below, which reproduces Mr. D'Ambrosio's projected revenues from five of his reports:

Although the revenue multiples used by Mr. D'Ambrosio can be computed from the sales revenues that are shown in his reports, the multiples themselves are not disclosed in Mr.

5      For reasons of space, P&G has not reproduced Mr. D'Ambrosio's revenue figures from his four other reports, which cover HIV, Photodynamic Therapy, Prostaglandin Hair Growth, and Colonic Delivery. The revenue projections in these four reports follow the same multiples set out above, with "breakthrough" revenues (for example) set to be 4.26 times "average".

D'Ambrosio's reports, and his reports do not describe <u>how</u> he arrived at the specific multiples used, <u>e.g.</u>, 4.26, 2.06, etc.

The references to "Myers and Howe" and "Grabowski and Vernon" are references to two published articles. As Mr. D'Ambrosio testified in his deposition, he had never before used these articles because this was the first time he had appraised a patented drug technology and therefore the "only time that I would have modeled drug revenue." (Dep. Vol. 1 at 16.) He also indicated that no person suggested that he should use these articles to perform his work in this case. (<u>Id</u>. at 20.) Instead, "[i]t was my research that uncovered this information." (<u>Id</u>.)

Because Mr. D'Ambrosio's appraisals cite and rely upon the Myers & Howe and Grabowski & Vernon articles, a brief description of each is necessary. Mr. D'Ambrosio's reference to "Grabowski & Vernon" is a reference to a 1994 article entitled <u>Returns to R&D on New Drug Introductions in the 1980s</u>. (This article is attached as Exhibit L.) In that article, the authors report on a study they conducted of the sales revenues earned by the 67 new drugs that were approved by the FDA and introduced into the U.S. market between 1980 and 1984. (Ex. L-Grabowski & Vernon at 385-86; <u>see also</u> Dep. Vol. 1 at 141-42.) Although the actual drug revenues for these 67 drugs are not reported in the article, the authors do include a graph showing the distribution of revenues for the first and second "deciles" of those 67 drugs, as well as a median and mean for the distribution. It is this graph that Mr. D'Ambrosio claimed to rely

upon in coming up with his sales figures. (Dep. Vol. 1 at 195-99.) The graph is reproduced below:

*H.G. Grabowski, J.M. Vernon / Journal of Health Economics 13 (1994) 383–406*     **391**



Fig. 2. U.S. sales profiles for different sample groupings.

(Ex. L- Grabowski & Vernon at 391.)

According to Mr. D'Ambrosio's deposition testimony, he interpreted the graph to show top decile peak revenues "between $700 and $800 million," a mean value "between 110 and 130," and a median value of approximately $35. (Dep. Vol. 1 at 197-98; Dep. Vol. 2 at 19.) Thus, according to Mr. D'Ambrosio, the peak sales of the top decile of drugs was 5 to 7 times the mean and 20 to 22 times the median. All of these multiples are <u>higher</u> than the 4.26 multiple actually used by Mr. D'Ambrosio in his reports to determine peak sales.

The second article cited in Mr. D'Ambrosio's report – "Myers & Howe" – refers to a 1997 article written by Stewart Myers and Christopher Howe, entitled <u>A Life-Cycle Financial Model of Pharmaceutical R&D</u>. (This article is attached as Exhibit M.) In that article, the authors describe "a financial simulation model of pharmaceutical research and development."

(Ex. M- Myers & Howe at 1.)  As the article states, this simulation "modele[ed] research programs, rather than single drug candidates," and the authors specifically warned that use of the model to value a single drug would be inappropriate and produce "arbitrary" results.[6]  (Id. at 15.)

As part of the simulation described in the article, Myers & Howe broke potential drugs into the same five categories used by Mr. D'Ambrosio: breakthrough, above average, average, below average, and dog.  However, unlike Mr. D'Ambrosio, Myers & Howe determined that the appropriate revenue multiple between "breakthrough" and "average" was 20, not 4.26 as used by Mr. D'Ambrosio.  As the article states:

> Based on Grabowski and Vernon's data, we set the peak sales of "breakthrough" drugs roughly 20 times higher than the peak sales of the "average,' i.e., median drug."

(Ex. M- Myers & Howe at 19.)

P&G disclosed expert rebuttal reports in this case on January 15, 2010, in which P&G's experts pointed out that the Myers & Howe article specifically indicated that it should not be used in the context of an individual drug valuation and that neither it nor the Grabowski & Vernon article supported the revenue projections offered by Mr. D'Ambrosio.  (Reports of R. Schwartz (Exhibit O at ¶ 6) and M. Bajaj (Exhibit P).)  Three months later, at his deposition in this case, Mr. D'Ambrosio disclaimed any reliance on the Myers & Howe study, and claimed to

---

[6]     During his deposition, Mr. D'Ambrosio acknowledged that "Myers and Howe said that you shouldn't use their model to value a single drug," and he conceded that their article was not intended "to be used in a valuation context."  (Dep. Vol. 2 at 183,  Dep. Vol. 1 at 117.)

rely instead on yet another article as support for his approach to revenues: Real-Options Valuation for a Biotechnology Company by David Kellogg and John Charnes. (This article is attached as Exhibit N.) (Dep. Vol. 1 at 117 ("I relied on the Charnes analysis … not this academic exercise by [Myers & Howe] who didn't mean this to be used in a valuation context.").) However, the Kellogg & Charnes article simply reports the same revenue multiples that are used in the Myers & Howe article. Specifically, the revenues for the "breakthrough" drug are projected to be 20 times the revenues of the "average" drug, not 4.26 as used by Mr. D'Ambrosio. The relevant portion of the Kellogg & Charnes article is reproduced below:

**Figure 1**. Peak annual revenue by category is as follows (in millions):

| | |
|---|---|
| Breakthrough | $1,323,920 |
| Above average | 661,960 |
| Average | 66,200 |
| Below average | 7,440 |
| Dog | 6,620 |

(Ex. N- Kellogg & Charnes at 78.) As the chart shows, the revenues for the breakthrough scenario ($1,323,920) are 20 times the revenues for the average scenario ($66,200). At his deposition, Mr. D'Ambrosio acknowledged that the revenue multiples he used were in fact different than the ones used by Kellogg & Charnes and he conceded that "In many ways, I diverged from their [Kellogg & Charnes'] method, in many, many ways."[7] (Dep. Vol. 1 at 158.)

When asked at his deposition to explain how he arrived at the specific multiples used in his analysis, despite multiple tries, Mr. D'Ambrosio could not provide that explanation and instead had to agree to provide it on a second day of deposition. (Id. at 185-202 ("Q. So

---

[7] One of the most significant ways that Mr. D'Ambrosio departed from the approach used in Kellogg & Charnes was in determining the probability that a drug would be successfully developed. The Kellogg & Charnes article used a 90% success rate for passing what are known as "preclinical trials," but Mr. D'Ambrosio used only a 50% probability of success for the P&G compounds. (Dep. Vol. 1 at 205-08.) This dramatically reduces value.

tomorrow early in your deposition we'll ask you these issues, and you'll explain to us then how you calculated the 4.26?  A.  I'd be happy to do.  I think it would clear up the record and make it go much quicker.").)  However, on that second day, Mr. D'Ambrosio again could not explain how he determined the specific multiples.  He indicated only that the multiples were "back[ed] into" to ensure that the "weighted average" of his revenue distribution was 30% higher than the "weighted average" of the revenue distribution reflected in the Myers & Howe and Kellogg & Charnes articles.  (Dep. Vol. 2 at 46.)  But Mr. D'Ambrosio could not provide an explanation for how he came up with this 30% factor and asserted that it was a "matter of professional judgment."  (Id. at 82 ("It's the hard call that you have to make as a professional valuing technology.").)  Furthermore, he acknowledged that the 30% weighting did not dictate the specific revenue multiples he chose and that there was "some judgment that I had to apply."  (Id. at 58-59.)  When asked to explain how he applied this judgment, Mr. D'Ambrosio could only say that he believed the multiples were a "reasonable approximation" and "representative."  (Id. at 59.)

## II.     ARGUMENT

### A.     Legal Standard

The general principles governing the admissibility of expert testimony, the requirements of Daubert and the provisions of Rule 702 are discussed at some length in P&G's other motions. For the sake of brevity, P&G will not repeat that full discussion here.  Briefly stated, Daubert and Rule 702 require the Court to ensure that testimony offered by the purported expert "rests on a reliable foundation."  Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579, 597 (1993).

Rule 702 sets out three conditions for testimony to be deemed reliable and admissible, i.e., the expert testimony is admissible if and only if "(1) the testimony is based upon sufficient

facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case." Fed. R. Evid. 702. The burden is on the proponent of the expert testimony to establish by a "preponderance of proof" that the expert testimony meets the requirements of <u>Daubert</u> and Fed. R. Evid. 702. <u>See, e.g.</u>, <u>Pride v. BIC Corp.</u>, 218 F.3d 566, 578 (6th Cir. 2000).

**B.      D'Ambrosio's Valuation Methodology Fails the Standards Set forth in Daubert and Federal Rule of Evidence 702**

There are two basic reasons why Mr. D'Ambrosio's proposed testimony fails the standards set forth in <u>Daubert</u> and Federal Rule of Evidence 702. First, the testimony is not the product of reliable principles and methods. Fed. R. Evid. 702(2). Second Mr. D'Ambrosio has failed to apply the principles and methods he purports to rely upon reliably to the facts of the case. <u>Id.</u> 702(3). This memorandum discusses each of these reasons in turn.

1.      <u>Mr. D'Ambrosio's Model Is Not Reliable</u>.

As described above, Mr. D'Ambrosio's basic valuation approach was to determine the amount of income attributable to the technologies by projecting the amount of revenues the technology would earn if successfully developed and ultimately approved as a drug. In performing this analysis, he assumed that each drug had a chance of falling within one of five "quality levels," and he projected different revenues for each of these quality levels. He did this by first determining the revenues associated with the "average" drug for the treatment category involved (<u>e.g.</u>, cancer, hair loss, HIV, etc.). Revenues for the four remaining quality levels were then projected off of the average using Mr. D'Ambrosio's standard multipliers described above.

At various times in this case, Mr. D'Ambrosio has claimed to find support for this method in three articles – the Grabowski & Vernon, Myers & Howe, and Kellogg & Charnes articles described above. By Mr. D'Ambrosio's own admission, however, his model departs

from each of these sources in "many, many ways," so his reliance on them is questionable in the first place. (Dep. Vol. 1 at 158.) This point will be described in detail below in the section of this memorandum that describes the unreliable and arbitrary manner in which Mr. D'Ambrosio applied his methodology. But there is a more basic reason the methodology fails. Even if Mr. D'Ambrosio had faithfully followed the methods set forth in these articles, they would not have formed a reliable basis for his testimony.

This is explicit in the Myers & Howe study, which as described above, expressly warned that it was a "model [of] research programs, rather than single drug candidates" and that its application to "single drugs" would require "arbitrary" assumptions that would produce arbitrary results. (Ex. M- Myers & Howe at 15.) Indeed, because Myers & Howe's simulation model predicted zero or negative returns across all drug classes, (Myers & Howe at 1, 30), it is apparent that Mr. D'Ambrosio's decision to use the model to predict the value of a single drug program was designed to and did in fact predict financial failure.

Because Mr. D'Ambrosio claimed in each of his reports to have "adopted" Myers and Howe's interpretation in valuing the individual drugs at issue in this case, P&G's experts noted in their rebuttal reports that Myers & Howe had warned against exactly that kind of use. After having read those reports, Mr. D'Ambrosio agreed at his deposition – repeatedly – that the Myers & Howe analysis was in fact not appropriate to be used in valuing a single drug. Remarkably, however, Mr. D'Ambrosio claimed that this was not an issue for him because he had not relied on Myers and Howe after all. (Dep. Vol. 2 at 76 ("[I]sn't it true that Myers and Howe said that their model should not be used to predict the success of any individual drug? A.

It is true it said that, and that's why I didn't rely upon it."); Dep. Vol. 1 at 116-17 ("Q. Did you rely on [the Myers & Howe article]? A. No, sir.").) [8]

With all due respect, this is revisionism of the worst kind.

It is perhaps understandable why Mr. D'Ambrosio now wants to disclaim reliance on the Myers & Howe study, but the claim that his reports do not purport to rely on the study is overwhelmingly belied by the words of his own reports in this case.

Mr. D'Ambrosio's citation to the Grabowski & Vernon article also provides no support for the approach he has followed, because the data reported in Grabowski & Vernon speak to an entirely different issue than the one for which Mr. D'Ambrosio cites it. Mr. D'Ambrosio cites the study to construct a distribution of potential revenues for a single type of drugs (e.g., cancer drugs, hair loss drugs, etc.). But Grabowski & Vernon's study says nothing at all about the likely distribution of revenues for a single drug or class of drugs, because like Myers & Howe's article, their study is not directed to a single drug or class of drugs. Instead, as mentioned above, the Grabowski & Vernon study measures revenue differences across all 67 drugs that were introduced between 1980 and 1984. (Ex. L- Grabowski & Vernon at 385-86.) The study therefore compares drugs that treat diseases and conditions of all types.[9] Different categories of drugs may generate different revenues for all sorts of reasons that have nothing to do with

---

[8] (See also Dep. Vol. 1 at 208 ("Their whole purpose of that report was to perform an illustrative calculation of what the industry – it was not to be used in valuation"); Vol. 2 at 182-83 ("Myers and Howe said that you shouldn't use their model to value a single drug").)

[9] Cancer drugs, however, were deliberately excluded from the study, because research for them had been funded in part by the NIH – a fact that would have interfered with the authors' efforts to measure returns on R&D. (Ex. L- Grabowski & Vernon at 386 n.3.)

relative quality, including differences in incidence rates and the stakes of the disease or disorder involved.

Mr. D'Ambrosio's core assumption in seeking to use the data reported in Grabowski & Vernon is that the exact same distribution of revenues that exists <u>across</u> drug types will also apply <u>within</u> individual drugs or drug types. There is, however, no logical reason why this should be so, and <u>none</u> of the articles that Mr. D'Ambrosio relies upon provides support for such an illogical proposition. As Mr. D'Ambrosio himself acknowledged during his deposition, he knows of no data to support such a proposition:

> Q.    Do you have any way of knowing whether the dispersion of revenues associated with a Cancer drug match the dispersion of revenues associated with all drugs in the 1980 to 1984 period for which new chemical entities were filed?
> A.    I've not independently performed that study.
> Q.    So your answer is no, you don't have any –
> A.    I don't have the data to know one way or the other.

(Dep. Vol. 1 at 144-45.)

The last article cited by Mr. D'Ambrosio – Kellogg & Charnes – likewise provides no support for Mr. D'Ambrosio's method. As the title of their article states – <u>Real-Options Valuation for a Biotechnology Company</u> – the authors of that study sought to value a company comprising a portfolio of biotechnology projects in comparison to its stock price. The point was not to value an individual drug as Mr. D'Ambrosio seeks to do here. <u>Nowhere</u> in the Kellogg & Charnes article is there any attempt to create a revenue projection for a specific class of drugs, as Mr. D'Ambrosio purports to do in each of his appraisals. Instead, as described above, Kellogg & Charnes simply reproduce the same industry-wide data that is cited in the Myers & Howe article, which show revenues for a "breakthrough" scenario that are 20 times higher than "average," not 4.26 as Mr. D'Ambrosio reports. (Ex. N- Kellogg & Charnes at 78.)

2.    <u>Mr. D'Ambrosio Applied His Method Unreliably to the Facts of the Case</u>.

The second reason that Mr. D'Ambrosio's opinions are inadmissible is that his methodology is applied in an unreliable and arbitrary manner to the facts of this case. Even if it were appropriate for Mr. D'Ambrosio to rely on the methods set forth in the various articles he cites, he acknowledges that he "diverged" from those methods "in many, many ways." (Dep. Vol. 1 at 158.)

The most important such example is in Mr. D'Ambrosio's application of his revenue multiples. As described above, Mr. D'Ambrosio projected sales for the breakthrough scenario to be 4.26 times the average. However, both the Myers & Howe and Kellogg & Charnes articles suggest that the appropriate multiple to use would be 20. <u>See</u> Ex. M- Myers & Howe at 19 ("Based on Grabowski and Vernon's data, we set the peak sales of 'breakthrough' drugs roughly 20 times higher than the peak sales of the 'average,' i.e., median drug.")

In his deposition, Mr. D'Ambrosio sought to explain this discrepancy by offering his opinion that the authors of those studies "chose the median" because "[t]hat information was available to them." (Dep. Vol. 1 at 146.) Mr. D'Ambrosio, on the other hand, claimed that he used <u>mean</u> sales figures because median sales figures were not available. (<u>Id</u>. at 145 ( "Q. So you didn't use the median? A. Absolutely not.").) When asked whether he tried to obtain median sales figures, Mr. D'Ambrosio testified that he did make such efforts but determined that "that information … wasn't readily available to us." (<u>Id</u>. at 216 ("There were phone calls to different vendors, and that information was either prohibitively expensive or not available.").)

Even if the purported "unavailability" of median sales figures were sufficient justification for Mr. D'Ambrosio's decision to use mean sales figures instead, the fact remains that Mr. D'Ambrosio's use of mean sales figures is not consistent with the articles he purports to rely on

either.  As Mr. D'Ambrosio testified, the chart from the Grabowski & Vernon article on which Mr. D'Ambrosio purports to rely shows that top decile sales are a multiple of 5 to 7 times higher than mean sales.  (See, supra, page 8.)  Mr. D'Ambrosio's standard 4.26 multiple, however, is less than both of those numbers.[10]

At his deposition, Mr. D'Ambrosio sought to explain away these inconsistencies between his approach and the materials he purportedly relied upon by claiming that the multiples used for the various scenarios were unimportant because the five quality levels (e.g., "breakthrough," "above average," etc.) were put in his reports "simply for illustrative purposes."  (Dep. Vol. 1 at 148-49.)  He claimed that what really "drives the model" is the weighted average of the revenues (Dep. Vol. 2 at 50-51), and that his weighted average was actually 30 percent higher than the weighted average used by Myers & Howe and Kellogg & Charnes (id. at 46).

Neither of these explanations, however, carries any weight.  First, Mr. D'Ambrosio's claim that the five quality levels are only "illustrative" and are unimportant to his model is belied by his own reports.  The sections of Mr. D'Ambrosio's reports presenting his sales projections say nothing about the scenarios being merely "illustrative."  To the contrary, the sales figures for

---

[10]     Furthermore, it is apparent from Mr. D'Ambrosio's various appraisals that he did not consistently determine sales for the "average" drug by reference to mean sales.  In the case of three of the technologies, he based revenues for the "average" scenario on projections provided by other witnesses in this case.  (Ex. I- Prostaglandin Glaucoma Appraisal at 75-76; Ex. C- HCV Appraisal at 72-73; Ex. D- Colonic Delivery Appraisal at 82.)  These projections have nothing whatsoever to do with the mean sales that Mr. D'Ambrosio claims to have used as the basis for the "average" scenario.  For the remaining three drugs, Mr. D'Ambrosio opined that the "average" scenario would be one where every drug in the category attained an equal share of the overall market.  (Ex. F- Hair Growth Appraisal at 73-74; Ex. E- Cox-2 Appraisal at 100-01; Ex. H- Prostaglandin Hair Growth Appraisal at 74-75.)  In that instance, projected sales would be both the mean and the median.  (Dep. Vol. 2 at 100, 185.)  Yet in determining breakthrough sales for these drugs, Mr. D'Ambrosio still applied a 4.26 multiple rather than 20, as provided in the articles he relies upon.

each quality level are presented as best estimates.

Moreover, given the content and structure of his appraisals, it is ludicrous for Mr. D'Ambrosio to claim that the individual quality levels are not important to his appraisals. His entire appraisal approach is premised on determining expected cash flows for each of the quality scenarios and then adding each of the scenario results to arrive at an overall conclusion of value for the technology. The calculation is illustrated in Schedule 1 of each of his appraisals, which show exactly this computation. For example, Schedule 1 of his Cancer Appraisal appears below:

As can be seen, the total value of the technology is determined by adding the values for the five individual scenarios together.[11]

---

[11]     As the schedule shows, Mr. D'Ambrosio concluded that the net present value of the Cancer technology is actually <u>negative</u>.

Second, even if it were true, as Mr. D'Ambrosio claims, that the "weighted average" of his revenues was set to be 30.5% higher than the weighted average of the revenues used by Myers & Howe and Kellogg & Charnes, it is difficult to see how that makes his model any more reliable. Instead, it is simply another instance in which Mr. D'Ambrosio departed from the articles that he claims to have relied upon. (Dep. Vol. 2 at 44 ("by adding a premium … I include sales that are far and above what Kellogg and Charnes has done").) The point of valuation is to arrive at the right number, not a number that favors one side or the other. Mr. D'Ambrosio could provide no explanation for how he arrived at this 30.5% figure, except that the number was supposedly chosen in his "professional judgment" to ensure that his results were higher – by "as much as ten times," he claimed – than the results portrayed in the Kellogg and Charnes article. (Dep. Vol. 2 at 70, 165-67; see also id. at 69 ("I'm above what [Kellogg & Charnes] would indicate the fair market value of this technology was").) That is not the hallmark of a scientifically reliable method. Instead, it is simply an ad hoc, arbitrary approach designed to reach whatever result Mr. D'Ambrosio deems appropriate.

### III. CONCLUSION

For the foregoing reasons, the Court should exclude Mr. D'Ambrosio's testimony in this case because it fails the tests for admissibility of expert opinion set forth in Daubert and FRE 702.

Respectfully submitted,

\s\ Daniel H. Schlueter
Kent L. Jones
Daniel H. Schlueter
Victoria A. O'Connor

Sutherland Asbill & Brennan LLP
1275 Pennsylvania Avenue, NW
Washington D.C. 20004
Telephone:  202/383-0100
Facsimile:  202/637-3593
kent.jones@sutherland.com
dan.schlueter@sutherland.com
tory.o'connor@sutherland.com

Of Counsel:
Mark A. Vander Laan (0013297)
Trial Attorney for Plaintiffs
Dinsmore & Shohl, LLP
1900 Chemed Center
255 East Fifth Street
Cincinnati, OH 45202-3172
Telephone: 513/977-8200
Facsimile: 513/977-8141
mark.vanderlaan@dinslaw.com

## CERTIFICATE OF SERVICE

It is hereby certified that, on this 28th day of May, 2010, a copy of PLAINTIFF'S

MEMORANDUM IN SUPPORT OF ITS MOTION IN LIMINE TO EXCLUDE TESTIMONY

OF NICHOLAS D'AMBROSIO, JR. was sent to the following counsel of record via the ECF

system:

> Robert J. Kovacev, Esq.
> Trial Attorney
> United States Department of Justice
> Tax Division
> Benjamin Franklin Station
> P.O. Box 55
> Washington, DC 20044
> Robert.J.Kovacev@usdoj.gov

/s/ Daniel H. Schlueter