# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF OHIO

| | |
|---|---|
| THE PROCTER & GAMBLE COMPANY ) <br> and SUBSIDIARIES, ) <br> ) <br>         Plaintiff, ) <br> ) <br>     vs. ) <br> ) <br> UNITED STATES OF AMERICA, ) <br> ) <br>         Defendant. ) <br>                                ) | No. 1:08-cv-608 <br> Judge Black |

**PLAINTIFF'S MEMORANDUM IN OPPOSITION TO DEFENDANT'S MOTION IN LIMINE TO EXCLUDE THE EXPERT TESTIMONY OF SAM A. KHOURY WITH RESPECT TO THE PHOTOBLEACH TECHNOLOGY**

## I.    INTRODUCTION AND SUMMARY

The Government has filed a motion in limine to bar P&G from "introducing, offering or admitting any testimony, including any written reports, of expert witness Sam A. Khoury as evidence at trial as to the Photobleach technology." (Gov't Motion (Dkt. No. 76) at 1.) The Government claims that Dr. Khoury's appraisal must be excluded because it relies in part on a separate report concerning the technology written by another individual, Dr. Arno Cahn, who died before the IRS completed its audit of the relevant tax years.

The Government's motion is meritless. P&G was <u>required</u> by IRS regulation to prepare its appraisals of these technologies contemporaneously with the donations. See 26 C.F.R. § 1.170A-13(c) (requiring "qualified appraisal" for all donations in excess of $5,000). Under the governing regulation, the <u>latest</u> date on which the appraisal can be completed is the due date of the taxpayer's income tax return. See id. § 1.170A-13(c)(3)(iv)(B). In the case of P&G's Photobleach Technology, which was donated on July 27, 2000, that meant the appraisal had to be

completed by September 15, 2001, <u>at the latest</u>, because that was the due date of P&G's tax return for the year in question.

P&G duly complied with these requirements by retaining Dr. Khoury to appraise the technology. It attached the results of that appraisal to its 2001 tax return as required by the IRS. The IRS, however, did not even <u>begin</u> its audit of P&G's 2001 tax return until 2005, and it did not complete that audit until 2008. Unfortunately, Dr. Cahn – who is cited as <u>one</u> of Dr. Khoury's sources – died before the IRS completed its work. The Court should categorically reject the Government's motion. It is nothing more than a cynical and unconscionable attempt by the Government to use its own interminable bureaucratic processes and Dr. Cahn's death to its own advantage. As described below, the motion has no basis in law, and it should be denied.

## II. FACTUAL BACKGROUND

### A. The Work Performed by Dr. Cahn and Dr. Khoury in 2000

The Photobleach Technology was donated by P&G to Case Western Reserve University in July 2000.[1] It consists of a series of chemical compounds that can be used as a photobleach, which is a type of bleach that is activated when exposed to sunlight, <u>e.g.</u> when clothes are dried on a clothes line. In 2000, P&G decided to donate the technology because its use was primarily limited to geographies where consumers line-dry their clothes, and it was therefore inconsistent with the company's detergent business focus at the time, which was based on globally-applicable products. (B00274453-54, attached as Exhibit A.)

---

[1] The photobleach compounds developed by P&G also have potential application in photodynamic therapy, which is a medical treatment used to treat cancerous tumors and other conditions. The parties have treated the two applications – Photobleach and Photodynamic Therapy – as two separate technologies, although both were donated by P&G to Case Western at the same time. The Government's motion is directed solely to the Photobleach Technology because that was the only application reviewed by Dr. Cahn.

When P&G was considering the donation of a technology, it commonly retained an outside expert with knowledge and experience in the industry in which the technology would be used. (Peterson Dep., attached as Exhibit B, at 50-51.) The purpose of retaining such an industry expert was to help P&G ensure that the technologies it was donating would have value to a charitable donee and to assist P&G in identifying an appropriate donee. As the head of P&G's donations and licensing group, Jeff Weedman testified:

> The industry expert was given full access to, to the best of our ability, all of the patents, all of the files, the inventors and the outside expert then was asked to make an independent opinion of the quality of the technology.
> That was important because we wanted to have an independent third party who was expert in the field be able to look at the technology and determine, are there ready substitutes, is the technology robust, how could it be utilized. I called this the evaluation phase. And by hiring a third party expert to do an evaluation, it provided us with independent, an independent assessment of how good the technology was.
> Additionally, we asked the independent expert what further development work, if any, was necessary to move this to the marketplace. And we further asked the independent expert if they could identify and what would they recommend in terms of the independent universities or whatever that would have the capability to do the additional work, if any, that was required.

(Weedman Dep., attached as Exhibit C, at 33-34.)[2]

In the case of the Photobleach Technology, the industry expert retained by P&G was Arno Cahn. At the time of the donation, Dr. Cahn had had an extensive career in the laundry detergent business, and he had published and lectured extensively on the subject of laundry detergents. (Cahn Report, attached as Exhibit D, at 2-3.) In early 2000, Dr. Cahn conducted an

---

[2] (See also Peterson Dep. at 42-43 ("Q. Why was there a need for a third party industry expert? A. We didn't want to donate things that didn't have value and we thought that getting an outside industry expert opinion would be a good way to get an independent party to validate the technology that we were donating.").)

3

assessment of the technology, and he produced a written report for P&G, which set out the results of that assessment. (Cahn Report.)

As noted in the Introduction to this Response, at the time of the donation, the IRS had detailed regulations in place specifying the "substantiation requirements" a taxpayer had to comply with in order to claim a charitable contribution deduction for property having a value greater than $5,000. See 26 C.F.R. § 1.170A-13(c)(2). Among other things, these regulations required the taxpayer to obtain a "qualified appraisal" of the property from a "qualified appraiser." Id. The regulations also specified in detail the materials that had to be included in a "qualified appraisal" and the types of qualifications necessary for an individual to qualify as a "qualified appraiser." See id. § 1.170A-13(c)(3), (5). Under the Regulation, the appraisal had to be prepared no earlier than 60 days prior to the donation and no later than the due date of the taxpayer's income tax return. See id. § 1.170A-13(c)(3)(i)(A) & (iv)(B).

Dr. Cahn was not an appraiser, and his report was not intended to be the "qualified appraisal" required by IRS regulations. P&G instead retained Dr. Khoury to prepare the "qualified appraisal." At the time of this assignment, Dr. Khoury was well-known for his expertise in appraising technology. He had performed well over 50 such valuations, and was regularly called upon by companies and professional associations to provide instruction to others on appropriate methods. (Khoury Dep., attached as Exhibit E, at 372-77.)

### B.    The Market Projections Made by Dr. Cahn and Dr. Khoury

The principal complaint in the Government's memorandum is its contention that Dr. Khoury merely "parrot[s] Dr. Cahn's opinions as to the incremental market share that might be achieve[d] by the photobleach technology." (Gov't Mem. (Dkt. No. 76-1) at 1.) Even a cursory review of the reports prepared by Dr. Cahn and Dr. Khoury reveals this to be a gross

4

misstatement. Unlike Dr. Khoury's report, Dr. Cahn's report states no specific opinion concerning the incremental market share that a product using P&G's technology would obtain. Instead, his report merely suggests a range of possibilities. Specifically, it contains the following chart, which displays the total additional sales that would result if the technology produced incremental market share growth of 1%, 2%, 3%, or 5%:

Value as a Function of Market Share and Profitability
[ million]

| INCREMENTAL MARKET SHARE | S | P | V |
|---|---|---|---|
| 1% | $ 104 | 10% | $10.4 |
| 1% | $ 104 | 5% | $ 5.2 |
| 2% | $ 208 | 5% | $10.4 |
| 3% | $ 312 | 6% | $18.7 |
| 5% | $ 520 | 5% | $26.0 |
| 5% | $ 520 | 10% | $52.0 |

(Cahn Report at 9.) (In the table, "S" represents the number of additional sales, in millions, generated by the incremental market share, and "P" represents the profit margin attributable to each sale. "V" is simply P multiplied by S.)

Although the chart reflects Dr. Cahn's opinion that incremental sales growth in the 1% to 5% range was possible, the text of Dr. Cahn's report refrains from offering an opinion about which number within this range — if any — would be most likely. As Dr. Cahn's report states:

> There remains a consideration of the likelihood of achieving an incremental market share of 1%. In-house experience with the introduction of a bleach-containing product is available. Partial data suggest that the introduction of Tide with Bleach has produced an

5

> incremental market share of more than 5% - in the US and Japanese markets. What a similar product would do in the "sunshine" markets is a matter of conjecture.

(Id. at 10.)

Contrary to the statements in the Government's memorandum, Dr. Khoury's report does not simply "parrot" these opinions from Dr. Cahn's report. To the contrary, unlike Dr. Cahn, who simply illustrated a range of possible outcomes, Dr. Khoury estimated a specific amount of additional sales that the technology would reasonably be expected to generate for a hypothetical willing buyer based on a specific forecast of incremental share growth. To be sure, in making this projection, Dr. Khoury cites the range of values offered by Dr. Cahn as <u>one data point</u> but it is only one data point among many. As Dr. Khoury's report states:

> **Revenue Projection**
>
> The licensee user of the photobleach technology is projected to be one of the major participants in the laundry soap market. Due to acquisitions and mergers, the number of significant sellers to this market is expected to be five or six in the 2002 to 2012 period. P & G is the major player with over 30% of the market. The remaining small players plus P & G are expected to total about 40% share. If there are four other major players, their average share would be 15%. This share of 15% will be assumed for our hypothetical company in the economic model.
>
> The potential adjusted market for photobleach has been selected and limited in a manner to give this product high potential for success. Dr. Arno Cahn considered potential incremental market share gains of 1% to 5%. P&G has experience with successful product innovations, such as Tide with Bleach, which gained more than 5% incremental market share.
>
> The superior properties of the cyanine photobleaches are forecast to enable the hypothetical company to obtain an additional share of the targeted adjusted market of 1% in the first year, 2% in the second year, 3% in the third year and 4% in the fourth year. The 4% will be maintained through the tenth year. By then, new technologies are likely to emerge which would start to impact the phthalocyanine photobleaches. Therefore, the market will be reduced to 3% and 2% for the last two years of the twelve-year valuation period.
>
> The 4% gain of laundry soap market share would increase our hypothetical company's share of the "sunshine" market form 15% to 19%. Since the "Sunshine" market is only 30% of the world market, this would only increase the hypothetical company's share of the world market from 15% to 16.3%. The impact of the technology is reflected in the incremental market share that the hypothetical company would obtain. As noted previously, the total laundry soap market is projected to increase by 3% per year in the 2000 to 2014 time period.

6

(Khoury Report, attached as Exhibit F, at 22.)  As this excerpt shows, in determining the appropriate incremental sales that would be generated by the technology, Dr. Khoury considered not only the range of values stated in Dr. Cahn's report, but also the market share growth experienced by an analogous product, Tide with Bleach (5%), the expected growth in the market as a whole (3%) and the fact that the maximum incremental market share would be only 1.3% (from 15% to 16.3%) considering the fact that the product would be limited to the "sunshine" (i.e., line-drying) market only.

During his deposition, Dr. Khoury was specifically asked whether his market projections were "the same as" Dr. Cahn's.  As demonstrated by the passage from Dr. Khoury's report above, they are not "the same," and Dr. Khoury confirmed that point in his answer:

> Q. Were your market projections the same as Dr. Cahn's market projections?
> A. We were a little bit more conservative. But they are in the range.

(Khoury Dep. at 417.)

### C. The Government's Appraisal Reports

During its audit of P&G's tax returns, the IRS retained its own appraiser to appraise the donated technologies.  In the case of the Photobleach Technology, the IRS appraiser was FTI Consulting ("FTI").  Although Dr. Cahn had died by the time the IRS/FTI appraisal was prepared,[3] the IRS/FTI appraisal extensively cites and relies upon the report of Dr. Cahn in appraising the technology, including the range of incremental market share (1% to 5%) set forth in his table above.  (See FTI Appraisal, attached as Exhibit G, at 2, 3, 5, 6, 7, 12, 13, 14, 25, 26.)  In addition, although the IRS/FTI appraisal differs from Dr. Khoury's appraisal in numerous

---

[3] Dr. Cahn died of cancer on October 26, 2004.  His obituary can be found at www.nyjnews.com/obituary/obit.php3?id=1585137.

respects and estimates a lower value as a result, it nevertheless accepts and relies upon the sales and market share estimates determined by Dr. Khoury in his appraisal.  (Id. at 13.)

After this litigation was commenced, the Government (now represented by the Department of Justice) hired James Woods to conduct another appraisal of the technology.  This appraisal, like the IRS appraisal, also cites and relies upon Dr. Cahn's report.  (See Woods Report, attached as Exhibit H, at 59 n.100 (citing Dr. Cahn for estimate of $1 million in further development costs); id. at 64 (certifying that the valuation analyst used Dr. Cahn's report during the valuation engagement).

The Department of Justice in this case also retained the services of Michael Hill, who it has proffered as a technical expert on detergents.  Like the IRS's appraiser (FTI) and the Department of Justice's new appraiser (Woods), Mr. Hill also relied on information contained in Dr. Cahn's report.  In particular, Mr. Hill relied on Dr. Cahn's assessment of the countries in which a photobleach-containing detergent could be sold because they received sufficient year-round sunlight:

> Q. "[Y]ou've created a list of those countries or regions, and that's the list that's Appendix 2?
> A. I didn't actually create that list.  That was a list created by Arnold Cahn at the request of Procter & Gamble.  And as I state in the second paragraph on that page, and I had no reason to doubt Dr. Cahn's calculation, so I was hoping to reproduce that.

(Hill Dep., attached as Exhibit I, at 107; see Hill Report, attached as Exhibit J, at 8 & Appendix 2.)  This list of countries prepared by Dr. Cahn and "reproduced" by Mr. Hill is, in turn, the same list used by the DOJ's appraiser for purposes of determining the value and expected sales of the technology.  (See Woods Report at Schedule 2A.)

8

### III. ARGUMENT

#### A. Dr. Khoury's Report and Related Testimony Are Admissible

The sole basis offered by the Government for its motion to exclude Dr. Khoury is the fact that Dr. Khoury cites the discussion in Dr. Cahn's report concerning market share and Dr. Cahn died while the IRS conducted its audit of P&G's tax return. The Government claims this raises an issue because Dr. Cahn "will provide no testimony at trial to support his opinion of incremental market share" and Dr. Khoury's "testimony will simply parrot Dr. Cahn's opinions as to the incremental market share." (Gov't Mem. (Dkt. No. 76-1) at 1.) The Government claims that this is so because Dr. Khoury supposedly "performed no independent analysis of the potential incremental market share that might result." (Id. at 4-5.)

In support of its argument, the Government cites several cases, which say as a general matter that one expert may not serve as a "mouthpiece" for another expert. These cases are all founded on the rule against hearsay. Although Rule 703 generally allows an expert to rely on hearsay "if of a type reasonably relied upon by experts in the particular field," the cases draw a distinction between reliance on such information and simply "parroting" the opinion of another witness. See, e.g., Mallatier v. Dooney & Bourke, Inc., 525 F. Supp. 2d 578, 664 (S.D.N.Y. 2007) ("[T]he expert witness must in the end be giving his own opinion. He cannot simply be a conduit for the opinion of an unproduced expert.") (emphasis in original).

As discussed below, the Government's argument is incorrect for four reasons.

1. Dr. Khoury's Report and Testimony
   Are Admissible as Contemporaneous Business Records

First, the Government's motion wrongly assumes that if Dr. Khoury's testimony does not satisfy the requirements of Rule 702, it is not admissible under any standard. This assumption is incorrect. As explained above, Dr. Khoury's appraisal report was prepared contemporaneously

9

with P&G's donation of the technology, and it was P&G's regular practice to obtain such an appraisal in connection with its donations.  Indeed, it was required to do so by the IRS substantiation rules described above and set forth in 26 C.F.R. § 1.170A-13(c).

Courts have regularly held that contemporaneously prepared appraisals are admissible as business records without requiring that the appraisal also satisfy Rule 702.  See, e.g., United States v. Licavoli, 604 F.2d 613, 622-23 (9th Cir. 1979) (affirming district court's admission of artwork appraisal as business record; rejecting argument that proponent was required to show that the appraisal also met the requirements of Rule 702); Selig v. United States, 740 F.2d 572, 578 (7th Cir. 1984) (contemporaneous appraisals of baseball team were business records admissible under Rule 803(6)); Deere & Co. v. Johnson, 271 F.3d 613, 623 n.8 (5th Cir. 2001) (same re: appraisal of combine); see also Aumund v. Dartmouth Hitchcock Med. Ctr., 611 F. Supp. 2d 78, 85-86 (D.N.H. 2009) ("As to the plaintiffs' Rule 702 objection, most authorities take the view that a party offering a document admissible as a 'report of regularly conducted activity' under Rule 803(6) . . . need not also show under Rule 702, the qualifications of the document's author to render any opinions in the report.")

Although Dr. Khoury's original 2000 appraisal was made a part of his Rule 26(a)(2) expert witness disclosure for purposes of this case, the appraisal was prepared eight years before this litigation commenced and was not prepared as a Rule 26 expert report.  Because Dr. Khoury's appraisal was prepared contemporaneously with the donation, and indeed, was prepared to satisfy IRS regulatory requirements that were a prerequisite to P&G's donation of the technology, the appraisal and any associated testimony is independently admissible as a business record without regard to Rule 702, just as the appraisals in Licavoli, Selig, and Deere & Co.

were. Because the Government's motion is premised solely on Rule 702, the Court does not even need to address the Government's Rule 702 arguments to deny its motion.

2. Dr. Cahn's Report Is Not Inadmissible Hearsay

Second, all of the "conduit" or "mouthpiece" cases cited by the Government are based on the rule against hearsay. See, e.g., TK-7 Corp. v. Estate of Barbouti, 993 F.2d 722, 732 (10th Cir. 1993). The first expert cannot testify as to the contents of a second expert's opinion, because the second expert's opinion is hearsay. See id. In this case, however, Dr. Cahn's report is not hearsay. His assessment of the technology (like Dr. Khoury's appraisal) is a business record exempt from the hearsay rule because it was prepared contemporaneously with P&G's donation of the technology and it was P&G's regular business practice to obtain such a report from an industry expert in connection with its technology donations. The report of Dr. Cahn is therefore a business record admissible under Fed. R. Evid. 803(6). See, e.g., Licavoli, 604 F.2d at 622-23; Selig v. United States, 740 F.2d at 578; Deere & Co. v. Johnson, 271 F.3d at 623 n.8; see also Ellis v. Phillips, 2005 WL 1637826, at *22 (S.D.N.Y. July 23, 2005) (allowing testimony of an expert who relied upon a DNA analysis conducted by a scientist who was unavailable to testify, because DNA analysis qualified as a business record).

3. Dr. Khoury Is Not Merely "Parroting" Dr. Cahn

As mentioned previously, the Government claims that Dr. Khoury's "testimony will simply parrot Dr. Cahn's opinions as to the incremental market share." (Gov't Mem. (Dkt. No. 76-1) at 1.) It says that this is so because Dr. Khoury supposedly "did no critical analysis of [Dr. Cahn's] numbers" and "performed no independent analysis of the potential incremental market share." (Id. at 4-5.) It therefore claims this case "is a classic example of one expert serving as a mouthpiece for another." (Id. at 9.)

This is a gross distortion of Dr. Khoury's testimony and report. Dr. Khoury is not simply "parroting" Dr. Cahn's opinions as to incremental market share. To the contrary, as the excerpt from Dr. Khoury's appraisal reproduced above clearly indicates, Dr. Khoury performed his own analysis of the additional sales and market share a willing buyer of the technology could reasonably expect to obtain. (See, supra, pages 6-7.) Unlike Dr. Cahn, who simply illustrated a range of possible outcomes from 1% to 5%, Dr. Khoury estimated a specific market share over time, with both a ramp-up and a ramp-down period. In support of his figures, Dr. Khoury cited the range of values reflected in Dr. Cahn's report (1% to 5%), but he did so simply as one data point considered in his overall analysis. In addition to Dr. Cahn's range, Dr. Khoury also relied on the market share growth experienced by an analogous product launched by P&G, Tide with Bleach (5%), the expected growth in the market (3%) and the fact that the maximum incremental market share assumed in his model (4%) would be only 1.3% of the detergent market as a whole considering the fact that the technology would be limited to "sunshine" (i.e., line-drying) geographies only.[4] (See, supra, page 7.)

Furthermore, during his deposition, Dr. Khoury clearly indicated that his projections were not "the same as" Dr. Cahn's but instead were "more conservative." (See Khoury Dep. at 417 ("Q. Were your market projections the same as Dr. Cahn's market projections? A. We were a little bit more conservative. But they are in the range.").) The Government is simply wrong in

---

[4] The IRS appraisal firm also recognized that Dr. Khoury's analysis of market share was not simply parroting Dr. Cahn. It described Dr. Khoury's analysis as follows: "The [Khoury] Report calculates the value based on a market share assumption growing to 4% based on 'superior properties of cyanine photobleaches' and because 'P&G has experience with successful product innovations, such as Tide with Bleach, which gained more than 5% incremental market share.'" (FTI Appraisal at 12-13, quoting Khoury Report at 22.)

asserting that Dr. Khoury "performed no independent analysis" and is merely "parroting" the opinions of Dr. Cahn.[5]

None of the cases cited by the Government involve a situation like this one where an expert witness independently confirmed or challenged the opinions of another. In fact, in all of the cases cited, the expert witness simply adopted in whole the report or opinions of another. See, e.g., Loeffel Steel Products, Inc., v. Delta Brands, 387 F. Supp. 2d 794, 807 (N.D. Ill. 2005) (expert placed "unquestioning reliance" on the damages report of another); TK-7 Corp. v. Estate of Barbouti, 993 F.2d 722, 732 (10th Cir. 1993) (expert witness adopted, in full, financial projections made by another); Dura Automotive Sys. v. CTS Corp; 285 F.3d 609, 614 (7th Cir. 2002) (expert witness adopted groundwater model in whole); Boygues Telecom S.A. v. Tekelec, 472 F. Supp. 2d 722, 729 (E.D.N.C. 2007) (expert adopted in whole the reports of withdrawn experts); Malletier, 525 F. Supp. 2d at 664 (expert witness assumed the validity of a regression analysis that formed the crux of his opinion).

4. P&G Is Not "Hiding" The Testimony of Dr. Cahn

Fourth and finally, a substantial factor in all of the cases cited by the Government is the fact that the second expert was available to testify but was nevertheless not called as a witness. The decisions thus speak of avoiding a situation where a party could "hide" an expert behind the

---

[5] The Government implies, without actually arguing, that Dr. Khoury does not have the necessary expertise to analyze market share for new technology. The Government has no basis for this insinuation. Dr. Khoury is one of the foremost technology appraisers in the country. At the time of the Photobleach donation, Dr. Khoury had performed well over 50 such appraisals, and was regularly called upon by companies and professional associations to provide instruction to others on appropriate methods. (Khoury Dep. at 372-77.) The projection of future income, including sales and market share, is a central feature of a technology appraisal. See, e.g., G. Smith and R. Parr, Valuation of Intellectual Property and Intangible Assets 310 (3d ed. 2000) ("Almost any valuation we can envision involves forecasting to some degree and many have forecasts as their central underpinning.")

work of others.  See, e.g., Dura Automotive Sys. v. CTS Corp., 285 F.3d 609, 614; id. at 622 (Wood, J., dissenting) (critiquing this "unwarranted assumption").

This case obviously involves completely different facts.  P&G is not "hiding" Dr. Cahn from the Government or the jury.  It hired Dr. Cahn and Dr. Khoury at the time of the donations in 2000 because that is what the relevant regulations required it to do.  P&G had no way of knowing at that time that Dr. Cahn would die before the IRS completed its audit.  It would be the height of unfairness to prevent P&G from presenting the appraisal testimony of Dr. Khoury because it took the Government nearly a decade to complete its review of his appraisal.  See Ellis v. Phillips, 2005 WL 1637826, at *22 (S.D.N.Y. July 23, 2005) (allowing expert testimony of scientist concerning DNA analysis conducted by another scientist who was unavailable to testify because he was suffering from brain cancer); Rancho Oil Co. v. United States, 1978 WL 1239, at **2-3 & n.1 (N.D. Tex. Nov. 22, 1978) (admitting appraisal in tax case where appraiser had died prior to trial under business record and residual exceptions to the hearsay rule).

That is particularly the case here, where both of the Government's appraisers (IRS and DOJ) and its technical expert cited and extensively relied on Dr. Cahn's report, and they did so after Dr. Cahn had died.  Indeed, the Government's technical expert, Mr. Hill, simply "reproduced" the opinions of Dr. Cahn directly into his report, and that information was then "reproduced" yet again by Dr. Woods in his appraisal for the Government.

### IV. CONCLUSION

The Government's arguments are meritless and its motion should be denied.  If, however, the Court determines that the motion should be granted in whole or in part, then the testimony of the Government's experts should be excluded as well.

14

        Respectfully submitted,

        \s\ Daniel H. Schlueter
        Kent L. Jones
        Daniel H. Schlueter
        Victoria A. O'Connor
        Sutherland Asbill & Brennan LLP
        1275 Pennsylvania Avenue, NW
        Washington D.C. 20004
        Telephone:  202/383-0100
        Facsimile:  202/637-3593
        kent.jones@sutherland.com
        dan.schlueter@sutherland.com
        tory.o'connor@sutherland.com

Of Counsel:
Mark A. Vander Laan (0013297)
Trial Attorney for Plaintiffs
Dinsmore & Shohl, LLP
1900 Chemed Center
255 East Fifth Street
Cincinnati, OH 45202-3172
Telephone: 513/977-8200
Facsimile: 513/977-8141
mark.vanderlaan@dinslaw.com

**CERTIFICATE OF SERVICE**

It is hereby certified that, on this 21st day of June, 2010, a copy of PLAINTIFF'S MEMORANDUM IN OPPOSITION TO DEFENDANT'S MOTION IN LIMINE TO EXCLUDE THE EXPERT TESTIMONY OF SAM A. KHOURY WITH RESPECT TO THE PHOTOBLEACH TECHNOLOGY was sent to the following counsel of record via the ECF system:

> Robert J. Kovacev, Esq.
> Trial Attorney
> United States Department of Justice
> Tax Division
> Benjamin Franklin Station
> P.O. Box 55
> Washington, DC 20044
> Robert.J.Kovacev@usdoj.gov

/s/ Daniel H. Schlueter